**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2980-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MATTHEW H. CABRITA,
a/k/a MATT CABRITA,

     Defendant-Appellant.

_____

Argued October 24, 2023 – Decided January 25, 2024

Before Judges Gooden Brown and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 18-02-0161.

Robert C. Pierce argued the cause for appellant.

Edward F. Ray, Assistant Prosecutor, argued the cause for respondent (Mark Musella, Bergen County Prosecutor, attorney; William P. Miller, of counsel and on the brief; Catherine A. Foddai, Legal Assistant, on the brief).

PER CURIAM

After the trial judge denied his motion to suppress evidence seized from his car and home without a warrant, defendant Matthew Cabrita entered a negotiated guilty plea to first-degree possession of a controlled dangerous substance (CDS) with intent to distribute and was sentenced to ten years in prison. Defendant now appeals from the denial of his suppression motion[1] and challenges his bargained-for sentence, raising the following points for our consideration:

> POINT I
>
> THE TRIAL COURT ERRED BY DENYING [DEFENDANT]'S MOTION TO SUPPRESS THE FRUITS OF THE WARRANTLESS SEARCH BECAUSE THE POLICE DID NOT HAVE REASONABLE SUSPICION OF CRIMINAL ACTIVITY TO CONDUCT THE MOTOR VEHICLE STOP OR TO REQUEST CONSENT FROM [DEFENDANT] TO SEARCH HIS MOTOR VEHICLE.
>
> POINT II
>
> THE TRIAL COURT ERRED BY DENYING [DEFENDANT]'S MOTION TO SUPPRESS THE FRUITS OF THE WARRANTLESS SEARCH BECAUSE [DEFENDANT]'S CONSENT TO SEARCH HIS MOTOR VEHICLE AND HOME WERE NOT VOLUNTARY.

---

[1] See R. 3:5-7(d) (authorizing appellate review of the denial of a suppression motion notwithstanding the entry of a judgment of conviction by way of a guilty plea).

A-2980-21

POINT III

THE TRIAL COURT ABUSED ITS DISCRETION BY NOT SENTENCING [DEFENDANT] ONE-DEGREE LOWER BECAUSE THE MITIGATING FACTORS SUBSTANTIALLY OUTWEIGHED THE AGGRAVATING FACTORS AND THE INTERESTS OF JUSTICE SO REQUIRED.

Based on our review of the record and the applicable legal principles, we affirm the conviction and sentence.

I.

At the suppression hearing, the State produced Detectives Michael Klumpp and Elliot Cookson, veterans of the Bergen County Prosecutor's Office (BCPO). Klumpp, a BCPO narcotics detective, testified that in August 2017, he received information from a confidential informant (CI) that defendant "was involved in the distribution of [CDS]." The CI provided defendant's telephone number and identified defendant's photograph from a Department of Motor Vehicle (DMV) database search conducted by Klumpp. The CI informed Klumpp that he had purchased CDS from defendant in the past either by going to defendant's residence at an apartment building on Bloomfield Avenue in Bloomfield or by defendant "deliver[ing] the drugs to the CI."

A-2980-21

At Klumpp's request, during the week of September 4, 2017, the CI arranged to make a controlled purchase of CDS from defendant at defendant's residence in Bloomfield. Prior to the controlled buy, police established surveillance in the area of defendant's residence. In addition, the CI was searched and provided with a specified amount of currency to complete the transaction. Klumpp followed the CI to defendant's residence and observed defendant exit the building, interact with the CI for a short period of time, and then return to his residence. After departing, the CI went to a predetermined location where he turned over the CDS he had purchased from defendant to Klumpp. The CI was also searched with negative results. On the same date, the surveillance team observed a Honda Civic with a New Jersey license plate that was registered to defendant and identified by the CI as belonging to defendant.

The same month, Klumpp received information from a different CI that "[defendant] was involved in the distribution of [CDS]." The second CI provided Klumpp with defendant's phone number, which was the same number used by the first CI to contact defendant, and identified the photo of defendant from the DMV database search. At Klumpp's request, the second CI made arrangements to conduct a controlled purchase of CDS from defendant on September 6, 2017, at a predetermined location in Wallington. Surveillance

teams were set up to conduct surveillance around defendant's residence in Essex County as well as the prearranged drug buy location in Bergen County.

Klumpp positioned himself in the area of defendant's residence and observed defendant enter his Honda Civic and depart the location at approximately 4:20 p.m. Officers maintained visual surveillance of defendant's vehicle while en route. At approximately 4:40 p.m., Cookson, a member of the investigative team, conducted an investigative motor vehicle stop of defendant's vehicle based on the prearranged drug transaction. The stop was made as defendant entered Wallington, but prior to him arriving at the prearranged location. Cookson acknowledged that no motor vehicle violations were observed prior to the stop.

Upon approaching defendant's vehicle, Cookson identified himself and informed defendant that "[he] was doing an investigation regarding him being involved in narcotics." Cookson asked defendant "to step out of the vehicle," and, after he complied, asked defendant "if he[ would] be willing to allow [Cookson] to search his vehicle." Cookson specifically informed defendant that he had the right to refuse to consent, that he had the right to withdraw his consent at any time, and that he had the right to be present during the search.

A-2980-21

After reading out loud to defendant the BCPO Consent to Search Vehicle form containing these rights, Cookson provided the form to defendant. The form indicated that the trunk, among other areas, could be searched. After reviewing the form, defendant consented to the search, both verbally and in writing, and signed the form at 4:50 p.m. During the search of defendant's vehicle, Cookson found "a clear plastic wrapper containing a white powdery substance suspected of being cocaine" "in the trunk, in a jacket pocket." As a result, defendant was placed under arrest.

When Klumpp arrived at the scene, the CDS had already been located in defendant's trunk. While defendant was handcuffed and seated in the back of Cookson's vehicle, Klumpp informed him of his Miranda[2] rights using a Miranda card. After reading defendant his rights, Klumpp asked defendant for consent to search his residence by reading a consent form out loud to defendant. Among other things, Klumpp advised defendant of his right to refuse to consent, of his right to withdraw his consent at any time, and of his right to be present during the search. After reviewing the form, defendant gave verbal consent to the search and signed the form at 5:40 p.m., authorizing a search of his home. The search was conducted at approximately 6:15 p.m. in defendant's presence.

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

A-2980-21

Among the items recovered from defendant's residence were suspected CDS, including cocaine and marijuana, drug paraphernalia, and over $86,000 in United States currency.

Defendant was subsequently charged in a four-count Bergen County indictment with first-degree maintaining or operating a CDS production facility, N.J.S.A. 2C:35-4 (count one); first-degree possession of CDS, namely, cocaine, in a quantity of five ounces or more with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(1) (count two); third-degree possession of CDS, namely, cocaine, N.J.S.A. 2C:35-10(a)(1) (count three); and second-degree money laundering, N.J.S.A. 2C:21-25(a) (count four).

Following the suppression hearing, the judge entered an order on August 7, 2018, denying defendant's motion. In an accompanying written opinion, the judge credited the testimony of both detectives "based upon their lengthy experience in the narcotics squad[,] their demeanor and body language while testifying, and the manner in which they responded to questions both on direct examination and cross-examination." As such, the judge made detailed factual findings in accordance with their testimony.

Next, the judge found the motor vehicle stop was justified by the "investigatory stop" exception to the warrant requirement. Specifically, the

A-2980-21

judge determined that the prior undercover drug buy between defendant and the first CI at defendant's residence and the second planned undercover drug buy between defendant and the second CI,

> together with the fact that defendant did traverse from Bloomfield in Essex County to Wallington in Bergen County en route to the predetermined transaction site, clearly and succinctly provide specific and articulable facts which rise to establish reasonable suspicion of criminal activity to justify a stop of defendant's vehicle <u>and</u> to request to search that vehicle.

The judge added that "[t]he recovery of CDS from defendant's vehicle" further justified the "request to search defendant's residence."

Turning to the voluntariness of defendant's consent to search his vehicle and residence, the judge stated:

> Defendant argues that he was removed from his vehicle; surrounded by numerous law enforcement officers; and handed a document to sign, knowing that incriminating evidence would be discovered. Under these circumstances, defendant asserts the "consent" was not voluntary, but was compulsory.
>
> Defendant was ordered to exit his vehicle and was advised he was the target of the CDS investigation. Although not under arrest, defendant was not free to leave, and was therefore in custody when Cookson requested consent to search his vehicle. . . .
>
> Cookson advised defendant that [he] had the right to withhold consent to search the vehicle, could be present at the search, and could terminate the search at

any time. The court further credits Cookson's testimony that defendant was cooperative and verbally consented to the search of his vehicle; understood his rights pertaining to the search; and subsequently signed the consent form without concern or threats imposed upon him.

Although defendant was already under arrest for CDS related offenses when Klumpp arrived on the scene to request consent to search his residence, he did not deny his guilt nor initially refuse to consent to the search of his residence.

Based upon the testimony adduced, the total time defendant was detained, one hour, was relatively minimal. The stop occurred at 4:40 [p.m.] Defendant signed the Consent to Search Vehicle form ten minutes later at 4:50 [p.m.] and signed the Consent to Search Residence f[or]m at 5:40 [p.m.], twenty minutes after Klumpp arrived on the scene at 5:20 [p.m.]

Considering all of the circumstances presented at the hearing, including the fact that defendant was detained as the target of the investigation, the State has met its burden that defendant knowingly and voluntarily consented to a search of the vehicle. Likewise, although defendant was under arrest after the search of his vehicle . . . and advised of his <u>Miranda</u> rights . . . , the consent to search his residence was given knowingly and voluntarily, without coercion or threat from law enforcement.

Therefore, all evidence subsequently obtained from the search of the motor vehicle and from defendant's residence is admissible at trial.

Thereafter, the parties engaged in plea negotiations, and, on April 24, 2019, defendant entered a negotiated guilty plea to count two of the indictment. In exchange, the State agreed to dismiss the remaining counts of the indictment and to recommend a maximum sentence of fifteen years in prison with four years of parole ineligibility. After ensuring compliance with Rule 3:9-2, governing the entry of guilty pleas, the judge accepted defendant's plea. At the sentencing hearing conducted on April 22, 2022, the State recommended a flat ten-year sentence based on defendant's cooperation with law enforcement. The judge sentenced defendant in accordance with the State's recommendation to a flat ten-year prison sentence, which sentence was memorialized in an April 27, 2022, judgment of conviction. This appeal followed.

II.

We first address defendant's challenge to the denial of his suppression motion. "When reviewing a trial court's decision to grant or deny a suppression motion, appellate courts '[ordinarily] defer to the factual findings of the trial court so long as those findings are supported by sufficient evidence in the record.'" State v. Smart, 253 N.J. 156, 164 (2023) (alteration in original) (quoting State v. Dunbar, 229 N.J. 521, 538 (2017)). That said, "[w]e will set aside a trial court's findings of fact only when such findings 'are clearly

mistaken.'" Dunbar, 229 N.J. at 538 (quoting State v. Hubbard, 222 N.J. 249, 262 (2015)). "We accord no deference, however, to a trial court's interpretation of law, which we review de novo." Dunbar, 229 N.J. at 538.

Turning to the substantive legal principles, "'[a] warrantless search is presumed invalid unless it falls within one of the recognized exceptions to the warrant requirement.'" State v. Gamble, 218 N.J. 412, 425 (2014) (quoting State v. Cooke, 163 N.J. 657, 664 (2000)). "[T]he State bears the burden of proving by a preponderance of the evidence that a warrantless search or seizure 'falls within one of the . . . exceptions . . . .'" State v. Elders, 192 N.J. 224, 246 (2007) (quoting State v. Pineiro, 181 N.J. 13, 19-20 (2004)).

The exceptions at issue in this case are an investigative stop and a consent to search. An investigative stop "is a procedure that involves a relatively brief detention by police during which a person's movement is restricted." State v. Goldsmith, 251 N.J. 384, 399 (2022). An investigative stop or detention "is permissible 'if it is based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity.'" State v. Shaw, 213 N.J. 398, 410 (2012) (quoting Pineiro, 181 N.J. at 20). "The standard for this form of brief stop or detention is less than the probable cause showing necessary to justify an arrest." Ibid. "However,

an officer's hunch or subjective good faith—even if correct in the end—cannot justify an investigatory stop or detention." Id. at 411.

"Determining whether reasonable and articulable suspicion exists for an investigatory stop is a highly fact-intensive inquiry that demands evaluation of '"the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions."'" Goldsmith, 251 N.J. at 399 (quoting State v. Privott, 203 N.J. 16, 25-26 (2010)). The inquiry "takes into consideration numerous factors, including officer experience and knowledge." Id. at 400.

When an informant's tip factors into the analysis,

> [a]n informant's "veracity" and "basis of knowledge" are two highly relevant factors under the totality of the circumstances. A deficiency in one of those factors "may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." An informant's veracity may be established in a variety of ways. For example, the informant's past reliability will contribute to the informant's veracity. With regard to the informant's basis of knowledge, if the informant does not identify the basis of knowledge, a reliable basis of knowledge may nonetheless be inferred from the level of detail and amount of hard-to-know information disclosed in the tip. Finally, independent corroboration of hard-to-know details in the informant's tip may also greatly bolster the tip's reliability.

A-2980-21

> [State v. Zutic, 155 N.J. 103, 110-11 (1998) (citations omitted) (first quoting State v. Smith, 155 N.J. 83, 93 (1998); then quoting Illinois v. Gates, 462 U.S. 213, 233 (1983); then citing State v. Novembrino, 105 N.J. 95, 123 (1987); and then citing Smith, 155 N.J. at 95).]

Turning to the consent to search exception, "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548 (1968). "The burden of proof is on the State to establish by clear and positive testimony that the consent was so given." State v. Shaw, 237 N.J. 588, 618-19 (2019) (quoting State v. King, 44 N.J. 346, 352 (1965)).

"To be voluntary[,] the consent must be 'unequivocal and specific' and 'freely and intelligently given.'" King, 44 N.J. at 352 (quoting Judd v. United States, 190 F. 2d 649, 651 (D.C. Cir. 1951)). To satisfy that requirement, the State must prove "that the individual giving consent knew that he or she 'had a choice in the matter.'" State v. Hagans, 233 N.J. 30, 39 (2018) (quoting State v. Carty, 170 N.J. 632, 639, modified, 174 N.J. 351 (2002)). Thus, "the consenting party must know that he[ or she] has the right to decline consent." State v. Birkenmeier, 185 N.J. 552, 563-64 (2006) (citing State v. Johnson, 68 N.J. 349, 353-54 (1975)).

"Consent is . . . a factual question to be determined from the relevant circumstances." State v. Koedatich, 112 N.J. 225, 264 (1988). In King, the Court "delineated factors for use by our courts in considering the voluntariness of consent." Hagans, 233 N.J. at 39 (citing King, 44 N.J. at 352-53). Generally,

> [f]actors potentially indicating coerced consent include:
>
>> (1) that consent was made by an individual already arrested; (2) that consent was obtained despite a denial of guilt; (3) that consent was obtained only after the accused had refused initial requests for consent to search; (4) that consent was given where the subsequent search resulted in a seizure of contraband which the accused must have known would be discovered; [and] (5) that consent was given while the defendant was handcuffed.
>
> Factors potentially indicating voluntariness of consent include:
>
>> (1) that consent was given where the accused had reason to believe that the police would find no contraband; (2) that the defendant admitted his guilt before consent; [and] (3) that the defendant affirmatively assisted the police officers.
>
> [Id. at 39-40 (second and third alteration in original) (citation omitted) (quoting King, 44 N.J. at 352-53).]

A-2980-21

"[M]any decisions have sustained a finding that consent was voluntarily given even though the consent was obtained under the authority of the badge or after the accused had been arrested." King, 44 N.J. at 353. "Voluntariness depends on 'the totality of the particular circumstances of the case' with each case 'necessarily depend[ing] upon its own facts.'" Hagans, 233 N.J. at 40 (alteration in original) (quoting King, 44 N.J. at 353). "Because determining 'whether consent was voluntarily given is a factual issue,' it is 'to be decided by the trial judge; and the appellate court should reverse only when it finds that determination to be clearly erroneous.'" State v. Williams, 461 N.J. Super. 80, 104 (App. Div. 2019) (quoting King, 44 N.J. at 354 (emphasis omitted)).

Applying these principles, we are satisfied that the judge's factual findings are amply supported by sufficient credible evidence in the record and the judge's legal conclusions are sound. We agree that Cookson had a reasonable articulable suspicion that defendant was engaged in criminal activity to justify the motor vehicle stop based on defendant having engaged in an undercover drug purchase days earlier and Cookson's reasonable belief that defendant was en route to Wallington to participate in a second undercover drug purchase. For the first time on appeal, defendant argues that the CIs' reliability was never established. However, the police investigation, including the successful completion of the

A-2980-21

first undercover drug buy, provided ample independent corroboration of the informants' information and "[o]nce corroborated, the confidential informant[s'] information gave rise to reasonable and articulable suspicion justifying an investigatory stop of defendant." Birkenmeier, 185 N.J. at 561 .

Defendant also asserts that "the State did not prove by a preponderance of evidence that . . . requesting [defendant's] consent to search" was "based upon a reasonable and articulable suspicion of criminal activity." We acknowledge that "[a] suspicionless consent search shall be deemed unconstitutional whether it preceded or followed completion of the lawful traffic stop." Carty, 170 N.J. at 647. However, this stop was not based on the observation of a motor vehicle violation but rather a police investigation during which defendant had already consummated one undercover drug buy and was believed to be en route to complete a second one. Thus, far from suspicionless, the stop was amply supported by a reasonable and articulable suspicion of criminal activity. Therefore, the consent search comported with Carty in that the detectives had "a reasonable and articulable suspicion that a criminal offense [was] being . . . committed prior to requesting consent to search." Id. at 648.

We also agree with the judge that defendant's consent to search his vehicle and his residence were freely and voluntarily given with full knowledge of his

rights, including his right to decline consent. Defendant argues that "[n]one of the factors identified in King that tend to show the consent was voluntary apply." However, voluntariness depends on the totality of the circumstances, with each case "necessarily depend[ent] upon its own facts," and "the existence or absence of one or more of the . . . factors is not determinative of the issue." King, 44 N.J. at 353.

Next, we address defendant's challenge to his sentence. We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful that we "should not 'substitute [our] judgment for those of our sentencing courts,'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)). Thus, we will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

"A sentence imposed pursuant to a plea agreement is presumed to be reasonable because a defendant voluntarily '[waived] . . . his right to a trial in return for the reduction or dismissal of certain charges, recommendations as to

sentence and the like.'" Id. at 70-71 (alterations in original) (quoting State v. Davis, 175 N.J. Super. 130, 140 (App. Div. 1980)); see also State v. Spinks, 66 N.J. 568, 573 (1975) (stating that "an appellate court should ordinarily defer to the presumed reasonableness of a bargained sentence"). Still, "[e]ven a sentence recommended as part of a plea agreement . . . may be vacated if it does not comport with the sentencing provisions of our Code of Criminal Justice." Fuentes, 217 N.J. at 71; see State v. Sainz, 107 N.J. 283, 292 (1987) (noting that sentencing standards "apply as well to sentences that result from guilty pleas, including those guilty pleas that are entered as part of a plea agreement").

Here, based on the risk of re-offense and the need for deterrence, the judge found aggravating factors three and nine. See N.J.S.A. 2C:44-1(a)(3), (9). On the other hand, given the absence of any "prior history of criminal activity," the "excessive hardship" of imprisonment on defendant, and the significant cooperation with law enforcement, the judge found mitigating factors seven, eleven, and twelve. N.J.S.A. 2C:44-1(b)(7), (11), (12). The judge concluded that although "the mitigating factors . . . outweigh[ed] the aggravating factors," the "facts and circumstances of th[e] case and the qualitative weight of the mitigating factors versus the aggravating factors [did] not warrant . . . sentencing [defendant] in the second[-]degree range."

18

Defendant argues the judge erred in not sentencing him in the second-degree range because he established his eligibility for a downgrade and "the interests of justice require that he be resentenced." Sentencing a first- or second-degree offender to a sentence one degree lower is governed by N.J.S.A. 2C:44-1(f)(2), which provides, in pertinent part:

> In cases of convictions for crimes of the first or second degree where the court is clearly convinced that the mitigating factors substantially outweigh the aggravating factors and where the interest of justice demands, the court may sentence the defendant to a term appropriate to a crime of one degree lower than that of the crime for which he was convicted.

In State v. Megargel, 143 N.J. 484 (1996), our Supreme Court observed that "the standard governing downgrading is high," id. at 500, and established the following two-part test to justify a downgrade: 1) "[that t]he court must be 'clearly convinced that the mitigating factors substantially outweigh the aggravating ones'"; and 2) "that the interest of justice demand[s] a downgraded sentence," id. at 496 (quoting N.J.S.A. 2C:44-1(f)(2)). The Court further explained that in applying this test, "the severity of the crime" is "the most . . . important factor . . . ." Id. at 500 (citing State v. Hodge, 95 N.J. 369, 379 (1984)).

> The Megargel Court identified several factors for the sentencing court to consider, including: "the degree

of the crime [which] is the focus of the sentence"; whether "[t]he surrounding circumstances of an offense may make it very similar to a lower degree offense"; and "facts personal to the defendant," including his "role in the incident." "The reasons justifying a downgrade must be 'compelling,' and something in addition to and separate from, the mitigating factors that substantially outweigh the aggravating factors."

[State v. Rice, 425 N.J. Super. 375, 384-385 (App. Div. 2012) (alterations in original) (citation omitted) (quoting Megargel, 143 N.J. at 500-01, 505).]

Here, in addressing the aggravating factors, the judge stated:

I certainly find aggravating factor three, the risk that you'll commit another offense. The facts and circumstances here clearly indicate that this wasn't some one-off isolated incident and there certainly was a profit motive at play here and I do believe that there's a risk that you'll commit another offense.

Aggravating factor nine, the need to deter you and others from violating the law. [The prosecutor] rightly points out especially during the past two years during the pandemic the scourge of drugs and the effects of that on the community . . . have been amplified. So, there's a strong need to deter you and others from violating the law in this regard.

Turning to the mitigating factors, the judge found:

As far as mitigating factors, mitigating factor seven, no prior history of criminal activity up to and including the commission of this crime. I am going to give some weight to mitigating factor [eleven], that your incarceration will entail an excessive hardship to yourself. You've been doing well for the past three

20

years. I can't ignore that. You've been working, you haven't been sitting just idly by waiting to go to state prison. So, I am going to give some weight to mitigating factor [eleven] and I am going to give significant weight to mitigating factor [twelve] as well.

Although the judge found that "[t]he mitigating factors outweigh[ed] the aggravating factors," the judge expressly found that "[t]hey do not substantially outweigh" the aggravating factors. Thus, we reject defendant's arguments that the judge misapplied the sentencing guidelines by considering aggravating factor three and not considering a host of other mitigating factors presented for the first time on appeal.

On the contrary, in determining that a downgraded sentence was not warranted, the judge adhered to the sentencing guidelines, properly identified and balanced the aggravating and mitigating factors, and imposed a flat ten-year sentence, the minimum sentence permissible in the first-degree range. See Case, 220 N.J. at 64-65 ("[W]hen the mitigating factors preponderate, sentences will tend toward the lower end of the range, and when the aggravating factors preponderate, sentences will tend toward the higher end of the range." (quoting State v. Natale, 184 N.J. 458, 488 (2005))).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21